## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| EWGS INTERMEDIARY, LLC, *et al.*,[1] | ) | Case No. 13-12876 (MFW) |
|  | ) |  |
| Debtors. | ) | Joint Administration Requested |
|  | ) |  |

**DEBTORS' MOTION FOR AN ORDER (A) APPROVING SALE PROCEDURES
AND BIDDING PROTECTIONS IN CONNECTION WITH "COMBINED SALE"
IN THE FORM OF STORE CLOSING SALES AND SALE OF CERTAIN OF THE
DEBTORS' ASSETS PURSUANT TO SECTIONS 363 AND 365 OF THE BANKRUPTCY
CODE; (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER APPROVAL
OF THE SALE OF CERTAIN OF THE DEBTORS' ASSETS; (C) APPROVING NOTICE OF
RESPECTIVE DATES, TIMES, AND PLACES FOR AUCTION AND FOR HEARING ON
APPROVAL OF (1) AGENCY AGREEMENT AND STORE CLOSING SALES, (2) ASSET
PURCHASE AGREEMENT AND SALE OF CERTAIN OF THE DEBTORS' ASSETS, AND
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; (D) ESTABLISHING PROCEDURES FOR NOTICING AND
DETERMINING CURE AMOUNTS; (E) APPROVING A POTENTIAL ALTERNATIVE
SALE PROCEDURE; AND (F) GRANTING OTHER RELIEF**

EWGS Intermediary, LLC and Edwin Watts Golf Shops, LLC, the debtors and debtors-in-possession herein (collectively, the "***Debtors***"),[2] hereby submit this motion (the "***Sale Procedures Motion***") pursuant to sections 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "***Bankruptcy Code***"), and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (each a "***Bankruptcy Rule***," and collectively, the "***Bankruptcy Rules***") and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: EWGS Intermediary, LLC (5356) and Edwin Watts Golf Shops, LLC (5356). The address of the Debtors' corporate headquarters is 20 Hill Avenue NW, Fort Walton Beach, FL 32548.

[2]    A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the Declaration of Lynda K. Barr (the "***First Day Declaration***"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), on November 4, 2013 (the "***Petition Date***").

of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "*Local Rules*"), for an order: (1) approving the proposed sale procedures and bidding protections substantially in the form attached hereto as **Exhibit A** (the "*Sale Procedures*") in connection with the Debtors' proposed disposition of certain of their assets (the "*Sale*") via store closing sales ("*Store Closing Sale*") and the sale of certain assets and assumption and assignment of certain contracts and leases (the " *Assets*," as defined in paragraph 11 below), as a whole to one bidder or in parts to more than one bidder, pursuant to sections 363 and 365 of the Bankruptcy Code; (2) establishing procedures for noticing and determining cure amounts for the assumption and assignment of certain executory contracts and unexpired leases; (3) scheduling an auction (the "*Auction*") for the sale of the Assets and a hearing to consider approval of the results of such Auction (the "*Sale Hearing*") pursuant to the Debtors' Motion for Order (A) Authorizing and Approving Combined Agency Agreement and Asset Purchase Agreement; (B) Approving, subject to higher or better offers, Store Closing Sales and the Sale of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code Free and Clear of all Liens, Claims and Encumbrances; (C) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code; (D) Granting Liens to Agent and Abandonment of Property; (E) Authorizing the Debtors to Consummate Transactions Related to the Above; and (F) Granting Other Relief (the "*Sale Motion*"); (4) approving the Debtors' proposed notice, substantially in the form attached hereto as **Exhibit B** (the "*Sale Notice*"), of the respective date, time and place for the Auction and the Sale Hearing (at which the Debtors will seek approval of their proposed combined Store Closing Sale and sale of the Assets and assumption and assignment of certain executory contracts and unexpired leases; (5) approving the Debtors' procedure for noticing and determining cure

2

amounts, including the approval of the notice identifying the proposed cure amounts for the executory contracts and unexpired leases to be assumed and assigned (the *"Cure Notice"*, a proposed copy of which is annexed hereto as **Exhibit C**); (6) approving potential alternative sale procedures; and (7) granting such other relief as is fair and equitable (the "*Sale Procedures Order*," a proposed copy of which is annexed hereto as **Exhibit D**).  In support hereof, the Debtors respectfully represent as follows:

## JURISDICTION

1.      On November 4, 2013 (the "*Petition Date*"), the Debtors each filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      No official committee of general unsecured creditors  (the "*Committee*") has been appointed in these cases by the Office of the United States Trustee to date.

3.      This Court has jurisdiction over this Sale Procedures Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2) (M), (N) and (O).  Venue of the Debtors' chapter 11 cases and this Sale Procedures Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 6004 and 6006 and Local Rules 2002-1, 6004-1 and 9006-1.

## INTRODUCTION

4.      As of the Petition Date, the Debtors lack the funds necessary to meet projected short-term cash needs due to a lack of availability under the Pre-Petition Credit Agreement and lower than expected cash flow from operations.

3

5.    The Debtors pre-petition lender continued to fund the Debtors while the Debtors attempted to find a potential buyer and/or investor in conjunction with either an out of court restructuring or through a bankruptcy proceeding.

6.    The Debtors, in consultation with their pre-petition senior secured lenders and pre-petition subordinated lenders (collectively, the "*Secured Lenders*"), and in the exercise of their considered business judgment, have determined that the best way to maximize value for the benefit of their estates and creditors is to attempt an expeditious sale of their assets through one or more transactions.

7.    In this regard, on November 1, 2013 Debtors executed a Term Sheet (the "*Term Sheet*") (attached hereto as **Exhibit E**) that contemplates a combined and integrated Agency Agreement ("*Agency Agreement*") with Hilco Merchant Resources, LLC ("*Hilco*") and GWNE, Inc. ("*GWNE*") and an Asset Purchase Agreement (the "*Purchase Agreement*") with GWNE providing for the approval of Store Closing Sales and the sale of the Assets to GWNE and the Debtors' assumption and assignment to GWNE of certain executory contracts and unexpired leases.[3] Hilco and GWNE are collectively referred to as the "*Joint Venture*" and the Agency Agreement and Purchase Agreement are collectively referred to as the "*Agreement*".    The Debtors also seek to expose the Agency Agreement, Purchase Agreement, Store Closing Sales and the Assets for competitive bidding through an Auction pursuant to the Sale Procedures herein.

8.    The Term Sheet contains a financing contingency with respect to the Purchase Agreement, which is part of an integrated transaction along with the Agency Agreement.    The Agency Agreement will have the same contingency.    Should this contingency not be met or

---

[3] The Debtors currently intend to file the Agency Agreement and Purchase Agreement on or before November 7, 2013.

4

waived by 4:00 p.m. Eastern Time on November 15, 2013, the Joint Venture shall forfeit $500,000.00 of their $1 million deposit and the Debtors shall have the option to either continue with the sale process contemplated herein with the Joint Venture or proceed to an auction sale without a stalking horse.

9.      Although Court approval of the proposed Store Closing Sales and sale of the Assets will be sought separately by the Sale Motion, the Debtors presently seek certain ancillary relief in connection with this proposed Sale.  Specifically, the Debtors request that the Court enter the proposed Sale Procedures Order, which approves the Bidding Protections, the Sale Procedures and the Auction and Sale Hearing Notice. The Debtors also request that the Court schedule the Sale Hearing to be conducted in connection with the Sale Motion on or before December 5, 2013.

**RELIEF REQUESTED**

10.     By this Motion, the Debtors respectfully request, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006, and Local Rules 2002-1, 6004-1 and 9006-1, entry of an order: (A) approving the Sale Procedures in connection with the Debtors' proposed combined Store Closing Sale and sale of the Assets, as a whole to one bidder or in parts to one or more bidders, subject to higher or better offers pursuant to sections 363 and 365 of the Bankruptcy Code; (B) scheduling the Auction; (C) scheduling the Sale Hearing in connection with the Sale Motion; (D) approving the Auction and Sale Hearing Notice; (E) establishing procedures for noticing and determining cure amounts for the assumption and assignment of certain executory contracts and unexpired leases; (F) approving potential alternative sale procedures; and (G) granting such other relief as is fair and equitable.

5

## PROPOSED SALE OF THE ASSETS

### A.    Description of the Assets

11.    The Assets to be sold to GWNE (the "**GWNE Assets**") and assets to be sold in the

Store Closing Sales by Hilco (the "**SCS Assets**" and together with the GWNE Assets,

collectively, the "**Assets**"),[4] subject to higher and better bids at Auction include, *inter alia*,

(i)    Real Property Leases relating to a minimum of forty (40) Store locations
(the "**GWNE Stores**"), the distribution center and the corporate offices;

(ii)    all Inventory located at the GWNE Stores and the portion of the Inventory
located at the distribution center allocated to GWNE by agreement with Hilco;

(iii)    all Intellectual Property and other Intangible Property (with the
understanding that the Debtors shall retain a temporary, non-exclusive license to
such Intangible Property necessary in order comply with its obligations under the
Agency Agreement);

(iv)    All personal property of Debtors located at the GWNE Stores, the
distribution center and the corporate offices and (B) certain of the personal
property of Debtors located at the non-GWNE Stores (subject to Hilco's rights to
use the Personal Property located at the SCS Stores in connection with the Store
Closing Sale); and

(v)    Certain executory contracts for equipment, software and services as may
be agreed to by GWNE prior to the Closing.

### B.    The Debtors' Solicitation and Marketing Efforts

12.    In October, 2013, the Debtors retained Bayshore Partners LLC the broker dealer

affiliate of Farlie Turner & Co., LLC ("**Bayshore**") as their investment banker and FTI

Consulting, LLC ("**FTI**") as their financial advisors to assist the Debtors in exploring certain

---

[4]    Defined terms appear in the Term Sheet and will appear in the Purchase Agreement and are intended to have the meanings ascribed to them
in such documents. In the event of any inconsistency between the description of the Assets set forth herein and the description of such
assets set forth in the Term Sheet, Purchase Agreement or Agency Agreement, the Term Sheet,  Purchase Agreement or Agency
Agreement, as applicable,  shall control.

6

strategic alternatives in order to maximize their value, including the potential sale of the Debtors' assets.

13.     Bayshore prepared marketing materials intended for distribution to prospective buyers of the Debtors' assets including a teaser, confidential investment memorandum and the aggregation of key company documents and further analysis for an online dataroom. Bayshore worked with the Debtors to develop a list of suitable potential buyers to be contacted on a discreet and confidential basis, after approval by the Debtors.

14.     FTI also contacted the known store closing agents to solicit bids for Store Closing Sales as an option.

15.     As of the Petition Date, Bayshore and/or the Debtors contacted approximately 35 potential strategic buyers and 175 financial buyers, out of which 35 executed confidentiality agreements and requested additional information, 3 conducted due diligence, and 1 visited the Debtors' headquarters and met with management.

16.     The Debtors received various offers for substantially all of their assets, either in whole or in parts and various store closing proposals. After consultation with their Secured Lenders, and in the exercise of their considered business judgment, the Debtors selected the combined proposal of GWNE and Hilco pursuant to the Term Sheet, Agency Agreement and Purchase Agreement as the highest and best offer for the Debtors' Assets, subject to higher and better offers pursuant to the Sale Procedures.

**C.     The Proposed Store Closing Sales**

17.     The Debtors propose to commence the Store Closing Sale immediately following the approval of the Sale Motion, and thereby stem the losses resulting from the continued operation of the closing stores. The Debtors also seek authority to enter into the Agency Agreement with Hilco who will serve as the Debtors' agent in conducting the Store Closing

7

Sales in accordance with the Sales Guidelines, a copy of which will be attached to the Agency

Agreement as Schedule 9.1, which procedures and guidelines are typical of and consistent with

those that have been approved in this and bankruptcy courts nationwide in similar transactions.

18.    It is critical to commence the Store Closing Sale as soon as possible for several

important reasons. First, the closing stores are operating at a loss and represent a drain on the

Debtors' liquidity. Thus, the sooner the Assets are sold (and the closing stores' leases are either

sold or rejected), the sooner the strain on the Debtors' liquidity will be mitigated. Second, delays

in the liquidation process could cause portions of the merchandise to become out of "season" or

out of date, thus, diminishing in value. Third, because the closing stores have not been

replenished with front end merchandise and inventory levels are diminishing, Hilco has made its

agreement contingent upon commencing the Store Closing Sale on Friday, December 6, 2013.

**D.    The Agency Agreement.**

19.    After further negotiation with the bidders and consultation with the Debtors'

professionals, and creditor constituents, the Debtors agreed (subject to finalization and this

Court's approval) to enter into the Agency Agreement with Hilco and GWNE combined with the

Purchase Agreement with GWNE.

20.    Although the Debtors respectfully refer the Court and parties-in-interest to the

Agency Agreement, which will be filed with the Court, in its entirety, certain of the material

terms are set forth below (with all capitalized terms having the meaning ascribed thereto in the

Term Sheet or Agency Agreement as applicable):

- Guaranteed Amount. As a guaranty of Agent's performance under the Agency Agreement, Agent will guarantee that the Debtors shall recover $45,000,000, subject to reduction by $0.90 per dollar by which the aggregate "cost value" of all (a) first quality finished goods inventory owned by the Debtors and located at the Locations on the Closing Date and (b) all on-order goods received within seven (7) days after the Closing Date is less than $45 million, in the aggregate, as of the Closing Date.

8

- **Expenses Reimbursed by Agent**. From the Sale Commencement Date through and including the Sale Termination Date, Agent shall be unconditionally responsible for all Store Closing Expenses enumerated in Section 4.1 of the Agency Agreement (including, without limitation, Occupancy Expenses, payroll and benefits for Retained Employees (subject to a cap), Agent's on-site supervision related costs, signs and banners, promotional costs, Sale supplies, telephone, postage/overnight or delivery/courier charges, utility charges, credit card and bank fees, costs related to moving, transferring or consolidating merchandise between SCS Stores, insurance costs, trash removal and cleaning costs, lawn care, security and building alarm costs, cost of capital and letter of credit fees, and any Retention Bonuses for Retained Employees and 50% of the cost of the physical inventory taking), incurred in conducting the Sale during the Sale Term.

- **Agent's Fee**. In consideration of the services to be provided by Agent pursuant to the Agency Agreement, Agent would be entitled to retain all Proceeds from the Sale of the Assets, after payment by Agent of Store Closing Expenses.

- **Distribution Center and Related Costs and Expenses**. From and after the Closing Date, certain Central Services, as determined by GWNE (in consultation with Agent) will be transitioned to GWNE as part of a transition services agreement with the Debtors or as a result of rehiring certain of the Debtors' employees to perform such Central Services post-Closing. To the extent that GWNE transitions Central Services required by Agent, Agent and GWNE will mutually agree upon the Agent's utilization of such required Central Services. For Central Services not transitioned to GWNE, but for which Agent reasonably requires utilization, the Debtors shall provide all such requested Central Services in connection with the Store Closing Sale and the Joint Venture shall reimburse the Debtors for the actual cost of providing such requested Central Services until expiration of the Store Closing Sale Term.

- **Payment**. Prior to the Sale Commencement Date, Agent shall wire to the Debtors  $33,750,000 of the Guaranteed Amount (less the $1,000,000) (the "Initial Guaranty Payment"), and post letters of credits in form and substance reasonably satisfactory to the Debtors on the Closing Date in an aggregate amount equal to the difference between (i) Initial Guaranty Payment and (ii)(x) the estimated Guaranteed Amount, after taking into account adjustments contemplated by the Term Sheet and the Definitive Documents, plus (y) 5% of the amount in (ii)(x) (the "Letters of Credit"). The proceeds paid at Closing must be sufficient to satisfy the obligations of Debtors to PNC in full under the pre and post petition financing documents, provided that such obligations shall not exceed $33,750,000. The balance of the Guaranteed Amount less any adjustment set forth

9

above will be paid within two (2) business days after finalizing the Inventory Taking.

- **Inventory Taking.** Debtors and Agent will jointly conduct a physical inventory taking in all of the Stores and the Distribution Center for purposes of calculating the aggregate Cost Value and Retail Price of the Inventory, pursuant to Inventory Taking Instructions to be agreed upon between the Debtors and the Joint Venture.

- **Sale Term.** Agent shall have the right to conduct the Store Closing Sale commencing the day after entry of the Sale Order, provided the Sale Order is entered on or before December 5, 2013, through (i) with respect to all Real Property Leases, no later than one hundred twenty (120) days after the Petition Date, or such other date as is otherwise mutually agreed upon by Debtors and Agent; and (ii) with respect to other SCS Assets, 180 days after the Closing Date. The Debtors shall not be responsible for any costs associated with the Assets after the 120th day after the Petition Date.

- **Sale Guidelines.** The Store Closing Sales shall be conducted in accordance with the Sale Guidelines attached to the Agency Agreement as Schedule 9.1. Agent shall be authorized to advertise and promote the sales as a store closing or similar themed sale. Agent shall be authorized to advertise or promote the Store Closing Sale as a "going-out-of-business" sale.

- **Employees.** Agent shall have the right to use the Debtors' store-level employees during the Sale Term and will reimburse the Debtors for actual payroll, and Employee benefits up to an agreed upon cap based upon a percentage of the aggregate base payroll. Agent may elect to pay, as an expense, a retention bonus to certain retained employees. The employees will remain Debtors' employees at all times.

- **Merchandise Returns/Gift Cards/Other Programs.** Although sales of all items of Inventory sold during the Sale Term shall be a "final sale", the Agent will accept returns of inventory sold prior to the Sale Commencement Date at the Closing Stores for 14 days after the Sale Commencement Date. Agent shall not honor any of the Debtors' gift cards, gift certificates, customer store credits and customer deposits (collectively, "Gift Cards"). Agent shall advise any customers that desire to redeem any such Gift Card that such Gift Card is redeemable at the locations acquired by GWNE under the GWNE APA.

- [**Security Interest in Merchandise and Proceeds Thereof.** Subject to the Agent's payment of the Initial Guaranteed Payment, issuance of the Letters of Credit and Agent's obligation to pay the Store Closing Expenses and other obligations under the Agreement, the Agent shall be granted a first priority lien on the SCS Assets, the Proceeds, and all proceeds thereof

10

> (specifically excluding the Guaranteed Amount, GWNE Assets and the Excluded Assets and proceeds thereof).

The Debtors believe that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their prudent business judgment.

## E.    The Sale Process

21.    The Debtors propose to (a) sell the Assets to GWNE pursuant to the Purchase Agreement and conduct Store Closing Sales through Hilco under the Agency Agreement; or (b) sell the Assets in whole or part, to the highest and/or best successful bidder(s) ("*Successful Bidder(s)*") at the Auction, as determined by the Debtors in accordance with the terms of the Sale Procedures Order and the Sale Procedures and in consultation with the Secured Lenders and as ultimately approved by the Bankruptcy Court. The Debtors shall provide a copy of this Motion to (i) any party, who is identified by the Debtors as a potential purchaser and other parties that are identified by third parties to the Debtor; (ii) the Office of the United States Trustee for Region 3; (iii) the 30 largest unsecured creditors for each Debtor and counsel to the Committee, if one is appointed in these cases; (iv) counsel for the DIP Lenders; (v) counsel for the Agent; (vi) counsel for Subordinated Lender; and (vii) parties-in-interest who have requested notice in these cases pursuant to Bankruptcy Rule 2002. However, prior to the Auction, the Debtors reserve the right to amend or otherwise change the terms of the Agreement in such a manner as the Debtors deem to be in the best interests of the Debtors' estates and as shall be agreed to, in writing, by the Debtors, the Agent and GWNE.

22.    As set forth in greater detail in the Agreement, the Debtors' estates will receive approximately $45 million for the Assets, subject to adjustment (the "*Purchase Price*"). Additionally, the Debtors will assume and assign to GWNE the Assumed Contracts and GWNE shall assume certain specified liabilities (defined therein as the "*Assumed Liabilities*").

11

F.     **The Sale Procedures**

23.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside the ordinary course of business may be by private sale or by auction. The Debtors believe that good cause exists to expose the combined sale contemplated by the Agency Agreement and Purchase Agreement to sale at auction and to approve the procedures proposed therefor. An auction conducted substantially in accordance with the Sale Procedures will enable the Debtors to obtain the highest and/or best offers for their Assets, thereby maximizing the value of the estates.

24.     The Debtors will permit existing interested parties and any new prospective purchasers and sale closing agents to perform reasonable due diligence with respect to their assets and will assist them with such efforts, including providing such potential purchasers and agents with reasonable access to the Debtors' books, records, facilities, customers and executives. This process will culminate in an Auction prior to the Sale Hearing, at which time either the Joint Venture or the Successful Bidder(s) shall be approved.

25.     While all interested bidders should read the Sale Procedures (attached hereto as **Exhibit A**) in their entirety, set forth below is a summary of such procedures, which summary is qualified in its entirety by the Sale Procedures:

a.     On a date no later than one (1) day following the entry of the Sale Procedures Order, the Debtors shall cause the Auction and Sale Hearing Notice to be sent by first class mail, postage prepaid, to (a) any party, who is identified by the Debtors as a potential purchaser and other parties that are identified by third parties to the Debtor; (b) the Office of the United States Trustee for Region 3; (c) the 30 largest unsecured creditors for the Debtors on a consolidated basis; (d) counsel to the Committee, if one is appointed in these cases; (e) counsel for the DIP Lenders; (f) counsel for the subordinated lender; and (g) parties-in-interest who have requested notice in these cases pursuant to Bankruptcy Rule 2002.

b.     The Assets may be sold in a single sale to a single bidder or in parts to different bidders, in combination with a store closing proposal, or as a full chain store closing, in each case free and clear of all liens, claims and encumbrances. The Sale will be on an "as is, where is" basis except as set forth in the Agency Agreement and Purchase Agreement and without surviving representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates. All of the Debtors' right, title, and interest in and to the Assets, or any portion

12

thereof, to be acquired will be sold free and clear of all Liens and Claims, including, without limitation, all pledges, liens, security interests, encumbrances, claims, charges, options, and interests including, but not limited to any recoupment, offset, defenses, debts and obligations thereon and there against, such Liens and Claims to attach to the proceeds of the Sale of the Assets.

      c.     To obtain access to all material non-public information that has been or will be delivered to the Purchaser and any other bidder concerning the Assets and Assumed Liabilities, each interested person or entity (an "*Interested Party*") must deliver (unless previously delivered) to Debtors' investment banker, Bayshore Partners LLC ("*Bayshore*"), 401 E. Las Olas Blvd., Suite 2360, Ft. Lauderdale, FL 33301, Attn: Steve Zuckerman (a) an executed confidentiality agreement, in form and substance satisfactory to the Debtors, which may be obtained from Bayshore, and (b) evidence of the Interested Party's source of capital or other financial ability to complete the contemplated transactions. As soon as practical after delivery of the foregoing, the Debtors, after consultation with Bayshore, the Secured Lenders and the professionals of any official committee of unsecured creditors appointed in the Cases, will determine in their reasonable business judgment whether an Interested Party will be reasonably likely to be able to complete and consummate its proposed transaction on terms no less favorable in the aggregate than the terms of the Purchase Agreement, and within the time frame contemplated in the Purchase Agreement, if it were the Successful Bidder.

      d.     Each offer, solicitation or proposal (a "*Bid*") from any person or entity (each, a "*Potential Bidder*") must be in writing and satisfy each of the following conditions to be deemed a "*Qualified Bid*" and for the Potential Bidder (other than the Purchaser) to be deemed a "*Qualified Bidder*". The bid must:

      (i)     identify the Potential Bidder and the applicable Potential Bidder's Sponsor and its representatives authorized to act on its behalf;

      (ii)     identify with particularity each and every executory contract and unexpired lease that is to be assumed and assigned pursuant to Potential Bidder's Modified Agreement (defined below) and demonstrate the financial ability to comply with future obligations under the executory contracts and unexpired leases;

      (iii)     be a good faith offer to purchase the Assets on terms that are no less favorable to the Debtors than the Agreement, contain a duly executed modified asset purchase agreement as well as a marked copy indicating changes from the Agreement, shall not contain contingencies, and must obligate the Potential Bidder to remain bound until the closing of the sale if selected as the Successful Bidder or the Back-Up Bidder (defined below) (such agreement, the "*Modified Agreement*");

      (iv)     demonstrate the financial capability to consummate the transaction;

13

(v)    contain written evidence of the corporate authority to enter into the transaction and evidence of the Potential Bidder's Sponsor's approval of the transaction in the case of a special purpose entity as a Potential Bidder;

(vi)    Provide for consideration in cash and if for substantially all of the Assets, such bid must equal or exceed the sum of:

(a)    The Purchase Price; plus;
(b)    A Minimum Initial Overbid amount of $1,600,000; comprised of a break up fee of $1,350,000 and an initial overbid amount of $250,000.

If such bid is for less than substantially all of the Purchase Assets, the consideration must, in the aggregate equal or exceed the Minimum Qualified Bid Amount;

(vii)    not request any breakup fee, expense reimbursement or similar type of payment;

(viii)    be accompanied by a Good Faith Deposit of $1,000,000; and

(ix)    be submitted on or before December 2, 2013 at 4:00 p.m. (prevailing Eastern Time) to Bayshore at the address indicated above.

e.    The Debtors, following consultation with Bayshore, the Secured Lenders, and professionals of any official committee of unsecured creditors appointed in the cases, shall make a determination regarding whether a Bid is a Qualified Bid and shall notify Potential Bidders whether their Bids have been determined to be Qualified Bids by no later than **noon (prevailing Eastern time) on December 3, 2013**. Any Potential Bidders that do not submit a Qualified Bid before the Bid Deadline will not be allowed to participate in the Auction or submit any offer after the Bid Deadline.

f.    If no conforming Qualified Bids are received (other than the Joint Venture's bid), the Debtors shall not hold an Auction and, instead, the Joint Venture shall automatically be deemed the Successful Bidder and the Debtors shall request at the Sale Hearing that the Court approve the Agency Agreement and Purchase Agreement with the Joint Venture.

g.    Between the Bid Deadline and the Auction, the Debtors, along with Bayshore (and in consultation with the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder. A Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for the Debtors, during the period that such Qualified Bid remains binding as specified herein.

h.    If the Debtors receive one or more Qualified Bids, the Auction will be held on **December 4, 2013 at 10:00 a.m. (prevailing Eastern Time)** at the offices of counsel to the

14

Debtors, Klehr Harrison Harvey Branzburg, LLP, 919 Market Street, Suite 1000, Wilmington, DE, 19801, or at any such other location or time as designated by the Debtors in a notice to all Qualified Bidders. On or before **5:00 p.m. prevailing Eastern Time, on December 3, 2013**, the Debtors or Bayshore shall provide each Qualified Bidder (including the Joint Venture):

     (a)     written notice of the Auction; and

     (b)     a copy of all Qualified Bids, including the Qualified Bid that the Debtors believes constitutes the highest or best offer and with which it intends to commence the Auction (the "*Pre-Auction Successful Bid*").

     i.     The Auction shall be conducted openly and all creditors of the Debtors' estates shall be permitted to attend. Without limiting the foregoing, the Debtors, the Joint Venture, Qualified Bidders, the U.S. Trustee, the Secured Lenders, and their respective representatives shall be entitled to attend the Auction. The Joint Venture and the Qualified Bidders must appear in person at the Auction, or through a duly authorized representative. The only parties eligible to participate in the Auction shall be Qualified Bidders who have submitted a Qualified Bid to the Debtors prior to the Bid Deadline. The Joint Venture shall be deemed a Qualified Bidder.

     j.     Bayshore shall direct and preside over the Auction. Only the Joint Venture and Qualified Bidders shall be entitled to make any subsequent bids at the Auction. The bidding at the Auction shall start at the purchase price stated in the Pre-Auction Successful Bid and continue, in one or more rounds of bidding, so long as during each round at least one Overbid (as defined below) is submitted. All Overbids shall be made and received on an open basis, such that all material terms of each Overbid will be fully disclosed to all other Qualified Bidders. The bidding at the Auction will be transcribed or videotaped and the Debtors shall maintain a transcript of all Bids made and announced at the Auction, including all Overbids and the Successful Bid.

     k.     Each Qualified Bidder shall be required to acknowledge and agree in writing that it has not engaged (and agrees not to engage) in any collusion with respect to any Bids, the Auction, or the Sale; provided that it shall not be deemed collusion for the Qualified Bidders whose Bids comprise a Portion Qualified Bid to Overbid in concert.

     l.     An "Overbid" is any bid made at the Auction after the Debtors' announcement of the Pre- Auction Successful Bid, that is an increment of at least $250,000 greater than the immediately preceding Bid, and that otherwise complies with the terms and conditions for a Qualified Bid as set forth herein. The Auction may include individual negotiations with Qualified Bidders, subject to the foregoing requirement that Overbids be made and received on an open basis. In the event an Auction is conducted, the Joint Venture shall be permitted, but is not required to, submit one or more Overbids.

     m.     To the extent that any Overbid includes consideration other than cash, the Debtors shall disclose their valuation of the total consideration offered in such Overbid (and the basis for their determination) in order to confirm that each Overbid meets the requisite bid increment and to provide a floor for further Overbids.

15

n.      The Debtors may adopt additional rules for the Auction at or prior to the Auction that, in their reasonable discretion (following consultation with Bayshore, the Secured Lenders and professionals of any official committee of unsecured creditors appointed in the cases), will better promote the goals of the Auction and the Debtors' duties and obligations as debtors-in-possession.

o.      In the event the Joint Venture submits an Overbid at the Auction (a "Joint Venture's Overbid") in order to top an Overbid submitted by another Qualified Bidder, the amount of the Break-Up Fee shall be added to the amount of the Joint Venture's Overbid for purposes of determining whether the Joint Venture's Overbid is the highest or best bid and whether such bid meets the requisite bid increment.

p.      The Auction shall continue until there is only one offer or combination of offers that the Debtors determine is the highest and/or best offer from among the Qualified Bidders (including the Joint Venture) submitted at the Auction (the "Successful Bid"). In making this decision, the Debtors may consider in the exercise of their reasonable business judgment (and in consultation with Bayshore, the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Agreement requested by each Qualified Bidder, and the net benefit to the Debtors' estates. The Qualified Bidder(s) submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser as are set forth in the applicable Agreement or Modified Agreement(s).

q.      The Qualified Bidder with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their reasonable business judgment at the Auction (and in consultation with Bayshore, the Secured Lenders, and the professionals of any official committee of unsecured creditors appointed in the Cases), shall be required to serve as a Back-Up Bidder (the "Back-Up Bidder"). Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors and Back-Up Bidder will be authorized, but not required, to consummate the Sale without further order of the Bankruptcy Court. The obligation to close of the Back-Up Bidder hereunder shall expire on the earlier of the Closing of a Sale to the Successful Bidder or the Outside Date.

r.      Within one (1) Business Days after adjournment of the Auction, but prior to the Sale Hearing, the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. In announcing the Successful Bid and the Back-Up Bid, the Debtors shall announce the material terms of each Bid and the basis for determining the total consideration offered. If no Auction is held, then the Bid of the Purchaser as represented by the Purchase Agreement shall be deemed to be the Successful Bid.

s.      The Debtors shall be bound by the Successful Bid only when such Bid has been approved by the Bankruptcy Court at the Sale Hearing (as defined below). Except as otherwise

16

provided in the Agreement or Modified Agreement(s), as applicable, and to the fullest extent permitted by the jurisdiction of the Bankruptcy Court, all of the Debtors' right, title and interest in and to the Assets shall be sold free and clear of all Liens and Claims, other than Assumed Liabilities, such Liens and Claims to attach to the proceeds. If the Debtors sell any or all of the Assets to a Successful Bidder other than the Joint Venture, the Debtors will pay the Break-Up Fee in accordance with the Agreement at the Closing.

t.      Except as otherwise provided herein, Good Faith Deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder (other than the Back-Up Bidder) by no later than the fifth (5th) Business Day following the conclusion of the Auction. The Good Faith Deposit of the Back-Up Bidder shall be held until the fifth (5th) Business Day following the Closing of the Sale to the Successful Bidder or the Outside Date, as applicable. The Good Faith Deposit of the Successful Bidder shall be held until the Closing of the Sale and applied in accordance with the Purchase Agreement or Modified Agreement(s), as applicable. If the Successful Bidder or Back-Up Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder or Back-Up Bidder, as applicable, the Successful Bidder's Good Faith Deposit or Back-Up Bidder's Good Faith Deposit, as applicable, shall be forfeited to the Debtors.

u.      The Successful Bid will be subject to approval by the Court. The Sale Hearing will take place on **December 5, 2013 at _____ a.m. (prevailing Eastern Time)** before the Honorable Mary F. Walrath, United States Bankruptcy Court for the District of Delaware, 824 Market Street, Courtroom 4, 5th Floor, Wilmington, DE, 19801. The Sale Hearing may be adjourned with the consent of the Successful Bidder from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

26.     The Debtors believe that the foregoing Sale Procedures provide an appropriate framework for selling the Assets in a uniform fashion and will enable the Debtors to review, analyze and compare all bids received to determine which bid is, or bids are, in the best interests of the Debtors' estates and creditors. Therefore, the Debtors respectfully request that this Court approve the Sale Procedures.

## G.     The Auction and Sale Hearing Notice and Notice of Motion

27.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the proposed sale of the Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the sale, and the deadline for filing any objections thereto. The Auction and Sale Hearing Notice (a copy of the substantial form of which is attached hereto

17

as **Exhibit B**) contains the type of information required under Bankruptcy Rule 2002(c), and also includes information on the Sale Procedures and the procedures for the submission of bids. This information will enable interested parties to participate in the Auction and at the Sale Hearing if they so choose. The Debtors accordingly request that this Court approve the form and content of the Auction and Sale Hearing Notice.

28.    The Debtors propose to serve the Auction and Sale Hearing Notice, within one (1) day of the entry of the Sale Procedures Order, by first-class mail, postage prepaid, to (a) all potential purchasers identified by the Debtors, (b) the Office of the United States Trustee, (c) counsel to the Committee, if any, (d) counsel to the DIP Lenders, (e) counsel to the Secured Lenders, (f) counsel to the Subordinated Lenders, (g) the parties-in-interest who have requested notice in these cases pursuant to Bankruptcy Rule 2002, (h) the parties to the Debtors' executory contracts and unexpired leases that may be subject to assumption and assignment or rejection, and (i) all government agencies required to receive notice of proceedings under the Bankruptcy Rules. The Auction and Hearing Notice provides that any party not on the Motion Service List that wishes to obtain a copy of the Sale Motion, including all exhibits hereto, may make such a request in writing to Klehr Harrison Harvey Branzburg LLP, 919 Market Street, Suite 1000, Wilmington, DE 19801, Attn: Domenic E. Pacitti, Esq.

29.    The Debtors will serve a copy of this Motion, including all exhibits hereto, by first-class United States mail, upon (a) the Office of the United States Trustee, (b) the 30 largest unsecured creditors for each Debtor and counsel to the Committee, if any, (c) counsel to the PNC, (d) counsel to the Subordinated Lenders, and (e) all parties that have requested notice pursuant to Bankruptcy Rule 2002.

30.    The Debtors submit that (a) the notice to be provided through the Auction and Sale Hearing Notice and this Motion and (b) the method of service proposed herein constitutes good and adequate notice of the sale of the Assets and the proceedings to be had with respect thereto (including, but not limited to, the Auction and the Sales Hearing). Therefore, the Debtors respectfully request that this Court approve the foregoing notice procedures.

**H.    Cure Notice**

31.    In connection with service of the Auction and Sale Hearing Notice, the Debtors propose to include a notice identifying the proposed cure amounts for the executory contracts and unexpired leases to be assumed and assigned (each an *"Assigned Contract"*).

32.    The Debtors propose that objections, if any, that relate to the proposed assumption and assignment of executory contracts and unexpired leases (including, but not limited to, any objections relating to the validity of the cure amount as determined by the Debtors or to otherwise assert that any amounts, defaults, conditions, or pecuniary losses must be cured or satisfied under any of the assigned executory contracts or unexpired leases as of the Sale Hearing Date, not including accrued but not yet due obligations, in order for such contract to be assumed and/or assigned) (a *"Cure Objection"*) shall be filed and served so as to be actually received by the Notice Parties, by [_____], 4:00 p.m. (the *"Cure Objection Deadline"*).

33.    Unless a Cure Objection is filed and served by a party to an Assigned Contract or a party interested in an Assigned Contract by the Cure Objection Deadline, all interested parties who have received actual or constructive notice hereof should be deemed to have waived and released any right to assert a Cure Objection and to have otherwise consented to the assumption and assignment of the Assigned Contract and be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or any other assignee of the relevant Assigned Contract that any additional amounts are due or defaults exist, or conditions to

19

assignment must be satisfied, under such assigned contract for any period prior to the Sale Hearing Date.

34.    The Debtors propose that for a Cure Objection to be valid, it must set forth the cure amount the party asserts is due, the specific types and dates of the alleged defaults, pecuniary losses, conditions to assignment, and the support therefor.  The Debtors further propose that hearings with respect to Cure Objections may be held (a) at the Sale Hearing, or (b) at such other date as the Court may designate, provided that if the subject Assigned Contract is assumed and assigned, the cure amount asserted by the objecting party (or such lower amount as may be fixed by the Court) shall be deposited with and held in a segregated account by the Debtors or such other person as the Court may direct pending further order of the applicable Court or mutual agreement of the parties.  A properly filed and served Cure Objection shall reserve such party's rights against the Debtors (but not against any purchaser) respecting the Cure Obligation, but shall not constitute an objection to the relief generally requested in the Motion.

**I.    Bidding Protections Are Fair And Reasonable**

35.    As set forth above, and in other pleadings filed with the Court, the Debtors have been aggressively marketing the Assets and will continue to do so.  While the Debtors have determined in their reasonable business judgment that an auction sale of certain of the Assets at this time, such an Auction would be of little value absent the Joint Venture setting the minimum purchase price for the Assets under the Agreement.  Subject to the terms of the Agreement, the Debtors will continue to negotiate with potential purchasers and will subject the Agreement to higher and better offers.

36.    The Debtors hereby request that the Court approve certain bidding protections to the Joint Venture that are customary in similar circumstances (collectively, the "***Bidding***

*Protections*"), including: (a) a Break-Up Fee in the amount of $1,350,000 (approximately three percent (3%) of the cash consideration received by the Debtors under the Agreement) ("*Break-Up Fee*"); (b) an initial overbid for all or a portion of the assets of the Debtors (or any combination of bids that the Debtors proposes to accept, in the aggregate) have a value, as determined in the reasonable judgment of the Debtors, that is equal to the sum of (i) $45 million (being the cash consideration payable by the Joint Venture under the Agreement), and (ii) $1,600,000, (the "*Initial Overbid*"); and (c) in the event that an Initial Overbid is made and the Joint Venture makes subsequent bids at an auction, or otherwise, the Joint Venture may "credit bid" the Break-Up Fee. Bidding increments for the Assets at the Auction shall be in aggregate minimum monetary increments that would, if accepted by the Debtors, result in the Debtors receiving aggregate consideration for all of the Assets of not less than $250,000 in excess of the consideration provided for in the highest then pending offer or Bid. The Debtors submit that cause exists to approve the Bidding Protections because they are fair and reasonable under the circumstances here. The Break-Up Fee shall be payable from the proceeds of the closing of a sale to a Successful Bidder, other than the Joint Venture.

37.    As set forth in the Sale Motion, there are several compelling business justifications for the proposed asset sale pursuant to the Agreement. Most importantly, the Agreement enables the Debtors to preserve the going concern value of most of their Assets. Accordingly, there are compelling reasons to approve the instant Sale Procedures Motion.

38.    The Debtors believe that the payment of the Break-Up Fee and the establishment of bidding procedures are both reasonable and necessary to induce the Purchaser to enter into the transactions encompassed by the Agreement and to obtain the highest price possible for the Assets.

21

39.    The payment of a Break-Up Fee is normal and customary in transactions of this nature. Such fees have frequently been approved in connection with asset sales in other chapter 11 cases. Moreover, without the agreement to this fee, the Debtors believe that it would have no initial offer for the Assets. Court approval of the Break-Up Fee is, therefor, in the best interests of the Debtors, their estates and their creditors.

40.    Payment of a Break-Up Fee as part of a sale process is a generally accepted practice. Break-Up Fees encourage an initial purchaser to invest the time, effort and money necessary to consummate the purchase of a debtor's assets, despite the possibility that such purchaser may not ultimately acquire the property. As such, it is an important tool to be used to encourage bidding. The determination of whether a Break-Up Fee or expenses should be allowed is made based on whether the fees and expenses are necessary to preserve the value of the estate. *In re O'Brien Environmental Energy, Inc.,* 181 F.3d 527, 534 (3d Cir. 1999). The considerations that underlie a debtor's business judgment to pay the Break-Up Fee are relevant to the Court's determination of the request. Id. Indeed, many courts have evaluated Break-Up Fee arrangements under the business judgment rule standard. *Cottle v. Storer Communications, Inc.,* 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't Stores,* 683 F.Supp. 422 (S.D.N.Y. 1988); *In re Integrated Resources, Inc.,* 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed by* 3 F.3d 49 (2d Cir. 1993).

41.    As to the propriety of approval of the Break-Up Fee, it is well-established that "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." *In re Integrated Resources, Inc.,* 147 B.R. at 658. In the instant case, the proposed Break-Up Fee is the product of good faith, arm's-length negotiations between the Debtors and Joint Venture. The Break-Up Fee is approximately 3% of

22

the consideration to the Debtors pursuant to the Agreement. It is the Debtor's business judgment that the Break-Up Fee is fair and reasonable in the perspective of the time, effort, cost and expense that the Joint Venture has incurred in negotiating the Agreement and the aggregate consideration to be paid by the Joint Venture. If other offers for the Assets are received, it will be because the Joint Venture has served as a "stalking horse" for such offers.

42. The Break-Up Fee of 3% is within the spectrum of Break-Up Fees approved by bankruptcy courts in Chapter 11 cases, particularly when compared to sales of a similar magnitude. *See e.g., In re Montgomery Ward Holding Corp., et al.,* Case No. 97-1409 (PJW) (Bankr. D. Del., June 15, 1998) (Court approved Break-Up Fee of 2.7%, or $3,000,000, in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.,* Case No, 97-1893 (PJW) (Bankr. D. Del., April 28, 1998) (Court approved Break-Up Fee of 3.12%, or $250,000, in connection with $8,000,000 sale transaction); *In re Ameriserve Food Distributions, Inc., et al.,* Case No. 00-358 (PJW) (Bankr. D. Del., April 3, 2000) (Court approved topping fee of $250,000 in connection with $38,500,000 sale of assets); *In re Anchor Container Corp. et, al.,* Case Nos. 96-1434 and 96-1516 (PJW) (Bankr. D. Del. Dec. 20, 1996) (Court approved Break-Up Fee of 2.43%, or $8,000,000, in connection with $327,900,000 sale of substantially all of debtors' assets); *In re FoxMeyer Corp. et al.,* Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr. D. Del., Oct. 9, 1996) (Court approved Break-Up Fee of 7.47%, or $6,500,000, in connection with $87,000,000 sale of substantially all of debtors' assets); *In re Edison Brothers Stores. Inc. et al.,* Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved Break-Up Fee of 3.5%, or $600,000, in connection with $17,000,000 sale of debtors' entertainment division); *In re Industrial General Corp.,* Case No. 95-895 (PJW) (Bankr. D. Del.) (Court approved Break-Up Fee of 3.57%, or $500,000, in connection with $14,000,000 sale transaction); *In re Buddy L. Inc.,*

23

Case No. 95-23S (HSB) (Bankr. D. Del.) (Court approved Break-Up Fee of 1.6%, or $800,000, in connection with $50,000,000 sale of debtors' toy division); *In re Continental Airlines, Inc.,* Case No. 90-932 (HSB) (Bankr. D. Del.) (Court approved Break-Up Fee of 2.4%, or $1,500,000, in connection with $61,000,000 sale transaction); *see also Integrated Resources*, 147 B.R. at 648; *In re Crowthers McCall Pattern, Inc.,* 113 B.R. 877, 879 (Bankr. S.D.N.Y. 1990); *In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). In general, Break-Up Fees encourage an interested party, i.e., the Joint Venture, to expend money, time and effort to negotiate with a debtor, notwithstanding that the transaction is subject to the risks presented by a pending chapter 11 case and uncertainty as to the approval of the transaction by the Bankruptcy Court. Break-Up Fees are intended to compensate the initial bidder for serving as a "stalking horse" and, thereby, encouraging the participation of other bidders for the assets to be sold.

43.    The Sale of the Assets is subject to higher and better offers. The Debtors will consider higher and better offers and advise potential buyers of the Assets. If higher and better offers emerge, they will be considered with reference and by comparison to the terms of the Agreement. Thus, there will be no loss or prejudice to the estate or its creditors if this Sale Procedures Motion is approved.

**J.    Alternative Sale Procedures**

44.    As set forth above, the Term Sheet contains a financing contingency with respect to the Purchase Agreement and the Agency Agreement that must be satisfied or waived by 4:00 p.m. Eastern Time on November 15, 2013. In the event that the financing contingency is not satisfied or waived by this time, the Debtors, at their option, may seek to immediately pursue an auction on the same time frame, but without a stalking horse bidder, pursuant to the alternative bidding procedures set forth on **Exhibit F** hereto.

24

## NO PRIOR REQUEST

45.    No prior request for the relief sought herein has been requested from this Court or any other court.

## NOTICE

46.    Notice of this Sale Procedures Motion has been provided in accordance with the notice procedures set forth above.

**WHEREFORE**, the Debtors respectfully request that the Court grant the relief requested in this Sale Procedures Motion and grant the Debtors such other and further relief as this Court deems just and proper.

Dated:  November 5, 2013
Wilmington, Delaware

/s/Domenic E. Pacitti

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
**KLEHR HARRISON HARVEY
BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:     (302) 426-9193

*Proposed Counsel to the Debtors
and Debtors in Possession*