# EXHIBIT E
# TERM SHEET

11

PHIL1 3167187v.6

*STRICTLY CONFIDENTIAL*

**TERM SHEET**

| Hilco or Agent: | Hilco Merchant Resources, LLC |
|---|---|
| GWNE | GWNE, Inc. |
| Joint Venture: | Hilco and GWNE. |
| Company: | Edwin Watts Golf Shops, LLC and its affiliates. |
| Nature of Transaction: | Agent will serve as Company's exclusive agent to conduct an orderly liquidation sale or other disposition of all of the Liquidation Assets (defined herein) in accordance with the terms and conditions of the Definitive Documents (the "Sale"). At Closing, Agent shall designate GWNE as the acquirer of certain Liquidation Assets (the "GWNE Assets") in accordance with the agreement between GWNE and Agent (the "Joint Venture Agreement") and, on the Closing Date, Company shall sell, transfer, or assume and assign, as applicable, the GWNE Assets to GWNE free and clear of all Liens pursuant to a mutually acceptable asset purchase agreement and other customary documents (collectively, the "GWNE APA"). As part of the Joint Venture Agreement, GWNE has agreed to (i) continue to conduct business at no less than 40 Stores (the "GWNE Locations") (the list of GWNE Locations shall be provided to Company by November 27, 2013), (ii) rehire certain Company employees at the GWNE Locations and hire a sufficient number of employees of Company's headquarters so that fewer than 50 such employees remain employees of Company after the Closing, according to terms and conditions to be agreed upon by GWNE and such employees, (iii) pay or provide adequate assurance that GWNE will pay certain Cure Amounts associated with Real Property Leases and Contracts related to the GWNE Locations, and (iv) assume specified obligations and liabilities associated with the Gift Cards. |
| Certain Defined Terms: | "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware. |
| | "Bankruptcy Code" means title 11, United States Code. |
| | "Cure Amount" means, with respect to each Contract or Real Property Lease, the amount required to cure pre-Petition Date monetary defaults or compensate a counterparty for actual pre-Petition Date pecuniary loss, as required by Bankruptcy Code sections 365(b)(1)(A) and (B). |
| | "Gift Cards" means Company's gift certificates, gift cards, customer |

| | | |
|---|---|---|
| | | store credits and customer deposits. |
| | | "Liens" means all liens, security interests, encumbrances, adverse rights, trusts, claims, pledges, covenants, restrictions, indentures, loan agreements, instruments, contracts, leases, licenses, options, rights of first refusal, rights of offset, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, claims for reimbursement, contribution, indemnity or exoneration, assignment, debts, charges, suits, rights of recovery, interests, alter-ego, successor liability, tax and other liabilities (including probate liabilities), and causes of action, to the fullest extent of the law, in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether imposed by agreement, understanding, law, equity or otherwise, or any other interest of any nature whatsoever of, on or with respect to any property or property interest. |
| | | "Petition Date" means the date on which the Company files a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. |
| | | "Proceeds" means the aggregate of (a) the total amount of all sales or other dispositions of Liquidation Assets after the Closing Date; and (b) all proceeds of Company's insurance for loss or damage to the Liquidation Assets or loss of cash in the Stores arising from events occurring during the Sale Term. For the avoidance of doubt, Proceeds shall include all forms of payment, including (without limitation) payment (i) in cash, (ii) by draft, check, wire transfer, money order, credit card, or other negotiable instrument, or (iii) otherwise and specifically excludes the Guaranteed Amount. |
| **Deposit and Contingency:** | | $1,000,000 payable upon execution of the Definitive Documents (the "Deposit"), $500,000 of which shall be deemed non-refundable and retained by the Company if GWNE does not satisfy or remove the following condition by 4:00 pm prevailing Eastern time on November 15, 2013: GWNE shall have obtained from one or more institutional lenders one or more loans on terms and conditions acceptable to it in its sole discretion of at least $35,000,000 in the aggregate. |

2

| Guaranteed Amount: | $45 million, subject to reduction by $0.90 per dollar by which the aggregate "cost value" of all (a) first quality finished goods inventory owned by Company and located at the Locations on the Closing Date and (b) all on-order goods received within seven (7) days after the Closing Date is less than $45 million, in the aggregate, as of the Closing Date.  This shall be the only potential Guaranteed Amount adjustment. |
|---|---|
| Payment of the Guaranteed Amount: | The Agent shall pay $33,750,000 of the Guaranteed Amount (less the Deposit) (the "Initial Guaranty Payment") at Closing, and post letter of credits in form and substance reasonably satisfactory to Company on the Closing Date in an amount equal to the difference between (i) Initial Guaranty Payment and (ii)(x) the estimated Guaranteed Amount, after taking into account adjustments contemplated by this Term Sheet and the Definitive Documents, plus (y) 5% of the amount in (ii)(x).  The proceeds paid at Closing must be sufficient to satisfy the Obligations to PNC in full under the pre and post petition financing documents, provided that such Obligations shall not exceed $33,750,000.  The balance of the Guaranteed Amount less any adjustment set forth above will be paid within two (2) business days after the Inventory Taking (defined herein). |
| Closing Date: | The later of (i) the date that is one (1) business day after entry of the Approval Order and (ii) such other date as Company and the Joint Venture shall agree.   Notwithstanding the foregoing, under no circumstances shall the closing take place on a date later than December 6, 2013 unless otherwise agreed to by the Joint Venture. |
| Liquidation Assets: | Agent shall have the sole and exclusive right to sell, transfer, assign, or otherwise dispose of the following assets of the Company (other than the Excluded Assets (as defined below)) and designate the acquirers and division thereof:<br><br>(i)     all rights in and to all "Intellectual Property", which includes (without limitation) all items listed on a Schedule and all of the following items owned by Company or in which Company has an interest: (a) inventions, discoveries, processes, designs, techniques, developments and related improvements whether or not patentable; (b) United States patents, patent applications, divisionals, continuations, reissues, renewals, registrations, confirmations, re-examinations, extensions and any provisional applications, or any such patents or patent applications, and any foreign or international equivalent of any of the foregoing; (c) United States registered, unregistered or pending trademark, trade dress, service mark, service name, trade name, brand name, logo, domain name, or business symbol and any |

3

foreign or international equivalent of any of the foregoing and all goodwill associated therewith and any applications in connection with the foregoing; (d) work specifications, software (including object and source code listing) and artwork; (e) technical, scientific and other know-how and information, trade secrets, methods, processes, practices, formulas, designs, assembly procedures, specifications owned or used by Company; (f) copyrights; (g) work for hire; and (h) any and all rights of Company to the name "Edwin Watts" or any derivation thereof, Company's entire customer list and database, and all assets used or useful by Company in the conduct of its business over the internet or in any electronic medium, including any websites or domain names owned by Company.

(ii)    All (i) first quality finished goods inventory owned by Company, including (without limitation) all on-order goods to the extent actually received by the Company, and (ii) damaged or defective inventory (collectively, the "Inventory").

(iii)   all owned supplies (including packaging materials), materials, tools, vehicles, rolling stock, leasehold improvements, goods and other tangible personal property, all owned trade furniture, fixtures and equipment ("FF&E"), machinery and equipment ("M&E"), personal property, office equipment, furnishings, computer hardware and spare parts relating thereto, wherever located, including, without limitation, such assets as may be located in Company's locations, distribution centers, warehouses, manufacturing facilities, and corporate office (collectively with the FF&E and the M&E, the "Personal Property").

(iv)    the contracts, personal property and other non-real property leases, commitments, purchase and sale orders, and agreements relating to any Liquidation Assets, whether oral or written (collectively, the "Contracts");

(v)     any and all leasehold interests of Company in real property, together with all leasehold improvements (other than Pro Shops), (collectively, the "Real Property Leases" or the "Locations");

(vi)    to the extent permissible, all originals and/or copies of all customer, mailings and supplier lists and other books, records, reports, studies, files, advertising materials and documents of Company, including (without limitation) all Account Documents (the "Books and Records"), but excluding

4

|  |  | incorporation documents and corporate minute books and other items under "Excluded Assets"; |
|  | (vii) | any and all other tangible and intangible assets of Company (the "Other Assets"), excluding the following (which shall constitute the "Excluded Assets"): any preference or fraudulent conveyance claims of Company arising under Chapter 5 of the Bankruptcy Code or otherwise; any causes of action, settlements or lawsuits in which Company is the plaintiff, including but not limited to the claims against British Petroleum and Visa and Master Card; cash and cash equivalents (other than real estate deposits at the retail store Locations (the "Stores") that are assumed and assigned to GWNE and last day's cash at the Stores which will be added to Guaranteed Amount); accounts receivable (inclusive of tax refunds and credit card receivables); all rights under the Definitive Documents; inventory sold in ordinary course prior to Closing; leases or contracts that expire or are terminated prior to closing, tax refunds; insurance claims; deposits not relating to any assumed Lease or Contract; workers' compensation or employee benefits deposits, corporate books and record and financial books and records for preparation of tax returns and documents; records needed to respond to litigation/compliance; and all rights of the Company under that certain lease with Equity Fund Advisors, Inc., dated as of March 10, 2009, as amended, related to the Store located in the Barrywoods Crossing shopping center in Kansas City, MO (which for purposes hereof shall not be deemed a "Location"). |
| **Assumption of Certain Liabilities:** |  | Except with respect to liabilities associated with (i) Gift Cards, which will be assumed by GWNE at Closing and redeemable at the GWNE Locations and on the Company website and (ii) those Cure Amounts which will be paid by the respective assignee in connection with the assumption and assignment of Real Property Leases and/or Contracts (if any) by Company, neither the Agent, GWNE, nor the Joint Venture shall assume any liabilities associated with the Liquidation Assets. |
| **Agent's Consideration:** |  | Agent shall receive as its consideration for services rendered to Company and payment of the Guaranteed Amount and Store Closing Expenses, all Proceeds of the Sale. Upon Agent's request, and in Agent's sole and absolute discretion, Agent shall be entitled to have all right, title and interest in and to the Liquidation Assets transferred to Agent or its designee free and clear of all Liens (the "Transferred Assets") for no additional consideration paid to Company, and Agent shall be entitled to sell, retain for Agent's own benefit, or otherwise dispose of the Transferred Assets and retain any and all proceeds from |

| | | |
|---|---|---|
| | | the sale, retention, or other disposition thereof. With respect to the Transferred Assets, upon Agent's reasonable request, Company shall take all actions, including executing any and all documents of transfer necessary or appropriate to vest title to the Transferred Assets in Agent or its designee. Notwithstanding the foregoing, the GWNE Assets shall be sold, transferred, or assumed and assigned, as applicable, by Company to GWNE free and clear of all Liens and shall not be transferred to, or become property of, Agent. |
| **Bid Procedures Order:** | (i) | Within 2 days after full execution of the Definitive Documents, but no later than the Petition Date, Company shall file a motion for entry of an order (the "Bid Procedures Order") to establish and/or approve, among other things, the following: |
| | (ii) | the Definitive Documents, subject to higher and better offers (the proceeds paid at Closing must be sufficient to satisfy the Obligations to PNC in full under the pre and post petition financing documents), provided that such Obligations shall not exceed $33,750,000; |
| | (iii) | procedures, acceptable to Company and the Joint Venture in its reasonable discretion, for the submission of higher and better offers; |
| | (iv) | a bid deadline of no later than 4:00 pm ET on December 2, 2013; |
| | (v) | a deadline object to final approval of the transactions contemplated by the Definitive Documents of no later than November 27, 2013; |
| | (vi) | an auction to be held no later than December 4, 2013; |
| | (vii) | a sale hearing to be held on December 5, 2013; |
| | (viii) | approval of bid protections (subject to the wavier of any and all financing contingencies or conditions to closing of Hilco, GWNE or Joint Venture by 4:00 pm Prevailing Eastern Time on November 15, 2013) as follows: in the event the Company closes a transaction with an alternate party, the Joint Venture shall be entitled to and shall receive payment of a "break-up" fee (inclusive of any expense reimbursement) equal to 3% of the Guaranteed Amount (the "Break-up Fee") conditioned upon Definitive Documents being fully executed, any deposit paid and all closing conditions removed or expired. Additionally, the Company shall not accept or pursue an alternate proposal unless such proposal provides for payment |

6

|  |  | to the Company of the sum of (1) the Guaranteed Amount, (2) the Break-up Fee, and (3) $250,000; and |
|  | (ix) | the Bid Procedures Order and motion seeking its approval shall provide that should any and all financing contingencies or conditions to closing of Hilco, GWNE or Joint Venture not be waived by 4:00 pm Prevailing Eastern Time on November 15, 2013, Company may seek approval, either as part of or in addition to the motion for approval of the Bid Procedures Order, of any and all other sale and bidding procedures at Company's sole discretion. |
| **Approval Order:** | | Within 2 days after full execution of the Definitive Documents, but no later than the Petition Date, Company shall file a motion for entry of an order (the "Approval Order") to approve the Definitive Documents and the transactions contemplated thereby, in a form reasonably satisfactory to Company and the Joint Venture, and provide among other things, that: |
|  | (i) | the terms of the Definitive Documents (and each of the transactions contemplated hereby and all other documents entered into in connection herewith) are in the best interests of Company and its bankruptcy estate and are approved in all respects; |
|  | (ii) | Company, Joint Venture, Agent and GWNE shall be authorized to continue to take any and all actions as may be necessary or desirable to implement the terms of the Definitive Documents and the transactions contemplated thereby; |
|  | (iii) | Company (with Agent's consent) and Agent shall be entitled to sell, collect, or dispose of all Liquidation Assets hereunder, free and clear of all Liens, with any presently existing Liens encumbering all or any portion of the Liquidation Assets, the Proceeds, or proceeds thereof attaching only to the Guaranteed Amount; |
|  | (iv) | Agent shall have the right to use the Locations, other than the GWNE Locations (except as mutually agreed to by GWNE and the Agent), and all related machinery, furniture, fixtures, equipment and other assets of Company, except for the GWNE Assets (except as mutually agreed to by GWNE and the Agent), whether owned, leased, or licensed, as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person; |

<table>
<tr><td></td><td>(v)</td><td>all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Company and Agent to consummate the transactions provided for in the Definitive Documents, including, without limitation, conducting and advertising of the Sale in the manner contemplated by the terms of the Definitive Documents;</td></tr>
<tr><td></td><td>(vi)</td><td>all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale;</td></tr>
<tr><td></td><td>(vii)</td><td>the Bankruptcy Court shall retain jurisdiction over the parties to enforce the Definitive Documents;</td></tr>
<tr><td></td><td>(viii)</td><td>Joint Venture, Agent and GWNE shall not be liable for any "claims" against or "debts" or other liabilities of Company other than as expressly provided for in the Definitive Documents, and shall have no successor liabilities whatsoever;</td></tr>
<tr><td></td><td>(ix)</td><td>Agent shall have, subject to Agent's obligations to pay the Guaranteed Amount, a valid, duly perfected first priority lien and security interest in the Liquidation Assets, the Proceeds, and all proceeds thereof (specifically excluding the Guaranteed Amount, GWNE Assets and the Excluded Assets and proceeds thereof); and</td></tr>
<tr><td></td><td>(x)</td><td>The Approval Order and motion seeking its approval shall provide that should any and all financing contingencies or conditions to closing of Hilco, GWNE or Joint Venture not be waived by 4:00 pm Prevailing Eastern Time on November 15, 2013, Company may seek approval, either as part of or in addition to the motion for approval of any and all other sales at Company's sole discretion.</td></tr>
<tr><td>**Sale Term:**</td><td colspan="2">The Sale shall commence on the first day following entry of the Approval Order (the "<u>Sale Commencement Date</u>"), but in no event later than December 6, 2013. Agent shall complete the Sale on or before the applicable Sale Termination Date (as hereinafter defined). The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "<u>Sale Term</u>". The Sale Termination Date may be (a) extended by mutual written agreement of Joint Venture and Company; or (b) accelerated by Agent</td></tr>
</table>

8

| | |
|---|---|
| | on a Liquidation Asset-by-Liquidation Asset basis, in which case Agent shall provide Company a Dropout Notice.<br><br>Agent shall complete the liquidation of all Liquidation Assets in accordance with the following time periods (each such date, an "applicable Sale Termination Date"; and the latest such date (as may be extended with the consent of the Company), the "Sale Termination Date"): (i) with respect to all Liquidation Assets (other than the distribution center and corporate office Real Property Leases and other associated Liquidation Assets), no later than one hundred twenty (120) days after the Petition Date, or such other date as is otherwise mutually agreed upon by Company and Agent; and (ii) with respect to the distribution center and corporate office, the Real Property Leases and other Liquidation Assets associated with the distribution center and corporate office, 180 days after the Closing Date. Company shall not be responsible for any costs associated with the Liquidation Assets after the 120th day after the Petition Date. |
| **Inventory and FF&E Disposition Sale and Payment of Related Expenses:** | With respect to certain Stores (other than Pro Shops), the Agent shall have the right to conduct "store closing", "sale on everything", "everything on sale", "everything must go", or similar themed sales of the Inventory at such Stores and additional inventory procured by Agent at Agent's sole cost and expense (the "Store Closing Sales").<br><br>From the Closing Date through the date on which the Store Closing Sale ends at each such Store, on a Store-by-Store and per diem basis (each a "Store Closing Sale Term"), the Agent shall bear all Store-level operating expenses of the Store Closing Sale that arise during the Store Closing Sale Term and are attributable to the Store Closing Sale, limited to the following:<br><br>(i)    actual payroll with respect to all "retained employees" used in connection with conducting the Store Closing Sale for actual days/hours worked at a Store during the Store Closing Sale Term (excluding hours worked during the Inventory Taking) as well as payroll for any temporary labor engaged for the Store Closing Sale;<br><br>(ii)    actual amounts payable by Company for benefits for retained employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for retained employees used in the Store Closing Sale, in an amount up to 20.6% of the aggregate base payroll for all retained employees used in connection with conducting the Store Closing Sale (the "Payroll Benefits Cap"). For purposes of determining adherence to the Payroll |

Benefits Cap, a calculation will be performed at each payroll period and an additional calculation, covering the entire Store Closing Sale Term, will be performed at the end of the Store Closing Sale Term;

(iii)   the actual limited Occupancy Expenses categorized on a Schedule, but in all cases limited on a per Store and per diem basis not to exceed the respective categories and amounts shown such Schedule;

(iv)   local and long-distance telephone and internet/wifi expenses incurred at the Stores, to the extent not included in the occupancy-related expenses categorized the Schedule referenced in subsection (iii) above;

(v)   retention bonuses for retained employees, in amounts agreed to by Agent;

(vi)   advertising and direct mailings relating to the Store Closing Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Store Closing Sale;

(vii)   credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Inventory sold in the Store Closing Sale;

(viii)   bank service charges (for Store, corporate accounts, and "agency accounts"), check guarantee fees, and bad check expenses to the extent attributable to the Store Closing Sale;

(ix)   costs for additional supplies at the Stores necessary to conduct the Store Closing Sale as requested by Agent;

(x)   all fees and charges required to comply with applicable laws in connection with the Store Closing Sale as agreed to by Agent;

(xi)   Store cash theft and other store cash shortfalls in the registers;

(xii)   all costs and expenses associated with Agent's on-site supervision of the Stores and other Locations, including (but not limited to) any and all fees, wages, bonuses, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores and other Locations, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Store Closing Sale);

(xiii)   postage, courier and overnight mail charges requested by Agent to the extent relating to the Store Closing Sale;

(xiv)   fifty percent (50%) of cost of the Inventory Taking Service;

(xv)   Agent's actual cost of capital (including letter of credit fees) and insurance;

(xvi)   Agent's reasonable out-of-pocket costs and expenses including but not limited to, reasonable legal fees and expenses, incurred in connection with the review of data, preparation, negotiation and execution of this Definitive Documents and any ancillary documents, and in connection with the Store Closing Sale;

(xvii)   third party payroll processing expenses associated with the Store Closing Sale;

(xviii)   the actual costs of all security (to the extent customarily provided in the Stores) including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance, to the extent not included in the occupancy-related expenses categorized on the Schedule referenced in subsection (iii) above;

(xix)   costs of transfers initiated by Agent of Inventory between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Inventory;

(xx)   trash and snow removal and housekeeping and cleaning expenses related to the Stores, to the extent not included in the occupancy-related expenses categorized on the Schedule referenced in subsection (iii) above; and

(xxi)   the actual costs and expenses of providing such additional services as the Agent deems appropriate for the Store Closing Sale (collectively, "Store Closing Expenses").

Notwithstanding anything herein to the contrary, to the extent that any Store Closing Expense category listed herein is also included on Schedule, such Schedule shall control and such Store Closing Expenses shall not be double counted. There will be no double payment of Store Closing Expenses to the extent that Store Closing Expenses appear or are contained in more than one Expense category.

Notwithstanding any other provision of this Agreement to the contrary, "Store Closing Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses, (iii) Occupancy

Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Store Closing Expense under (iii) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Locations (other than the Stores), and/or (v) any other costs, expenses or liabilities payable by Company not provided for herein, all of which shall be paid solely by Company promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

The Agent's obligations to pay all Store Closing Expenses are Store specific and cease at each Store on a per diem basis upon Agent vacating each Store premises in broom clean condition.   Upon vacating each Store, Agent shall have the right to abandon any Liquidation Assets in each such Store without liability to the Company or any other third party, including (without limitation) the landlord.

As used herein, the following terms have the following respective meanings:
 "Central Service Expenses" means costs and expenses for Company's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, and accounting (collectively, "Central Services").

"Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Store Closing Sale Term:  (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

"Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Company's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

| | |
|---|---|
| **Inventory Taking & Gross Rings:** | Commencing on the Closing Date, Company and Agent shall cause to be taken a SKU level "cost value" and "retail price"  physical |

inventory of the Inventory located in all Locations at Company's "cost value" and "retail price" (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Locations as soon as practicable (the date of the Inventory Taking at each Location being the "Inventory Date" for each such Location), but in any event no later than ten (10) days after the Closing Date (subject to the availability of the Inventory Taking Service). All on-order Inventory that is in-transit as of the Inventory Date shall be subject to a supplemental Inventory Taking at the Locations where such in-transit Inventory is delivered thereto.    Company and Agent shall jointly employ RGIS or other mutually agreed upon national inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on a Schedule (the "Inventory Taking Instructions"). The Joint Venture shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service. Company shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service (up to a maximum of $40,000). Except as provided in the immediately preceding two sentences, Company and Agent shall each bear their respective costs and expenses relative to the Inventory Taking. Company and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Company agrees that during the conduct of the Inventory Taking, the applicable Location shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Location. Company and Agent further agree that until the Inventory Taking in a particular Location is completed, neither the Company nor Agent shall: (i) move Inventory within or about the Location so as to make any such items unavailable for counting as part of the Inventory Taking; or (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Inventory or any other kind of in-store pricing signage within the Location. Company agrees to cooperate with Agent to conduct the Inventory Taking (including without limitation by making available to Agent information relating to sales, units, costs, "cost value" and "retail price", and making available to Agent Company's books, records, work papers and personnel to the extent reasonably necessary to calculate the "cost value" and "retail price" of the Inventory). Each Location will be closed during the Inventory taking; provided, however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Locations will be closed for business. The Inventory Taking, including, but not limited to the final inventory report, shall be reconciled by the Company and Agent as soon as practicable following the Inventory Taking.

13

|  | At each Location, for the period from the Closing Date until the Inventory Date for such Location, Agent and Company shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes ("Gross Rings"), and (ii) cash reports of sales within such Location. Register receipts shall show for each item sold the "cost value" and "retail price" for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Store Closing Sale. All such records and reports shall be made available to Agent and Company during regular business hours upon reasonable notice. Any Inventory included in the Store Closing Sale using the Gross Rings method shall be included as Inventory. |
|---|---|
| **Designation Rights:** | Agent shall have the exclusive right to act as Company's exclusive agent for the purposes of (a) marketing and disposing of the Liquidation Assets through the applicable Sale Termination Date and (b) to designate the ultimate purchaser, acquirer, assignee, transferee, licensee, or designee (including a lessor), which, for the avoidance of doubt, may be the Agent or one or more affiliates of the Agent, as determined by Agent in Agent's sole and absolute discretion (collectively the "Designation Rights"). Company shall, upon such election by Agent, take such actions as may be reasonably required to effectuate all Designation Rights. In that regard, during the Sale Term, Company agrees to cooperate with Agent to arrange for the sale or other disposition of the Liquidation Assets, with such sales, dispositions, and collection efforts and settlements to be on such terms as Agent shall determine in its sole and absolute discretion. Without limiting the generality of the foregoing, Company agrees: (i) to provide Agent with all due diligence materials and information in its possession as Agent shall reasonably request in connection with its efforts to market and attempt to sell or otherwise dispose of the Liquidation Assets, (ii) cooperate with Agent, its agents and any potential purchasers, acquirers, assignees, transferees, licensees, or designees of any of the Liquidation Assets and provide unlimited access to the Locations thereof, and (iii) provide Agent with copies of all offers and/or bids and/or expressions of interest in any the Liquidation Assets received by Company prior to or after the Sale Commencement Date and, thereafter Company shall direct all bids and/or expressions of interest regarding any the Liquidation Assets to Agent, including any bids or expressions of interest received by an end user and/or a landlord or any agent thereof. It is further agreed that Company shall cooperate with any proposed auction or private sales which Agent may, in its sole and absolute discretion, elect to utilize in order to sell or otherwise dispose of the Liquidation Assets, and Agent shall have the right in its sole discretion to remove any Liquidation Asset from a public auction and to have such Liquidation Asset assigned through a private sale in accordance with Sections 363 and |

14

|  | 365 of the Bankruptcy Code, subject to Bankruptcy Court approval. |
|  | For the avoidance of doubt, and notwithstanding anything to the contrary in this Agreement, Agent's Designation Rights will continue in respect of, and the Definitive Documents will continue to apply to, the Liquidation Assets if a Sale Notice is received by Company prior to the expiration of the Sale Term. |
|  | Notwithstanding the foregoing, the GWNE Assets shall be sold, transferred, or assumed and assigned, as applicable, by Company to GWNE free and clear of all Liens.  Agent's Designation Rights with regard to the GWNE Assets are limited solely to causing Company to sell, transfer, or assume and assign, as applicable, the GWNE Assets to GWNE free and clear of all Liens pursuant to the terms of the Definitive Documents. |
| **Agent's Dropout Rights:** | At any time prior to the expiration of the applicable Sale Term, Agent shall have the right, upon seven (7) days' written notice (the "Dropout Notice Period"), which right may be exercised at any time and from time to time in Agent's sole and absolute discretion, to provide notice to Company (each such notice, a "Dropout Notice") of Agent's election to discontinue its efforts to market and attempt to sell or otherwise dispose of any Liquidation Asset (other than the GWNE Assets) (each, a "Dropout Asset" and, collectively, the "Dropout Assets").  Upon the effective date of any Dropout Notice, (i) Agent shall have no further obligation or liability with respect to the subject Dropout Asset, and (ii) Company shall thereafter be solely responsible for all such Dropout Asset(s) from and after the effective date of the Dropout Notice.  Upon Agent's delivery of a Dropout Notice, all rights to the Dropout Assets shall revert to Company, and Company may dispose of such Dropout Asset in such manner as Company may elect, and one hundred percent (100%) of all proceeds realized upon a disposition of such Dropout Asset shall be the exclusive property of Company (and shall not constitute Proceeds).  The delivery of a Dropout Notice shall not result in a reduction of the Guaranteed Amount payable hereunder unless such Liquidation Asset(s) was excluded due to a Company breach of the Definitive Documents. Prior to the expiration of the Dropout Notice Period, the Agent, in its sole and absolute discretion, may withdraw any Dropout Notice upon written notice to Company. |
| **Sale Notices:** | At any time prior to the expiration of the applicable Sale Termination Date for any Liquidation Asset, Agent shall have the right, which right may be exercised at any time and from time to time, in Agent's sole and absolute discretion, to provide notice to Company (each such notice, a "Sale Notice") of Agent's election to require Company to |

15

|  | seek Bankruptcy Court authority to sell or otherwise dispose of the Liquidation Assets identified in the subject Sale Notice(s) (each, a "Designated Third Party Asset" and, collectively, the "Designated Third Party Assets") and assign same to the purchaser, acquirer, assignee, transferee, licensee, or designee identified by Agent. Within three (3) business days following the date Agent delivers a Sale Notice and related information (including the applicable transaction documents) to Company, Company shall take all requisite actions (including, without limitation, actions required under Sections 363 and Section 365 of the Bankruptcy Code) to promptly sell, assume and assign the applicable Designated Third Party Asset(s) to the applicable designee identified in such Sale Notice(s). All costs incurred by Company with respect to a Sale Notice (including, but not limited to, attorneys' and other professional fees and costs and noticing and copying fees and costs) shall be reimbursed by Agent within (2) business days of receipt of an invoice from Company. Without limiting the generality of the foregoing, upon receipt of a Sale Notice, Company shall use commercially reasonable efforts to obtain the expedited entry of an order of the Court approving the sale or other disposition of the Designated Third Party Asset(s) and the sale or other disposition of such asset(s) to the specified designee, each in a form and substance reasonably acceptable to Agent, its designee, and Company. The term "Designated Third Party Assets" does not refer to GWNE Assets and all necessary approvals of transactions involving the GWNE Assets, including without limitation approval of the GWNE APA, shall be included in the Approval Order. |
|---|---|
| **Adequate Assurance & Payment of Cure Amounts:** | If applicable, Agent shall cause the designee under any Sale Notice for a Designated Third Party Asset to provide adequate assurance of future performance with respect to such Designated Third Party Asset in accordance with the Sale Order. Additionally, Agent or such designee, as applicable, shall pay all Cure Amounts. Cure Amounts associated with Contracts related to the GWNE Locations or the GWNE Assets and Real Property Leases for the GWNE Locations which are assumed and assigned by Company to GWNE shall be paid by GWNE. |
| **Carrying Costs and Expenses:** | Except with respect to the payment of Store Closing Expenses, Cure Amounts, or as otherwise set forth in this Term Sheet or the Definitive Documents, Company shall be responsible for paying all other costs and expenses associated with each Liquidation Asset from and after the Petition Date through and including the earlier of (i) the closing of a transaction, subject to a Sale Notice or otherwise, with respect to each such Liquidation Asset and (ii) the applicable Sale Termination Date with respect to each such Liquidation Asset. |

16

| | |
|---|---|
| **Rejection:** | Regardless of whatever elections Agent shall make under the Definitive Documents, the legal cost and expenses of the rejection at any time of any one or more Liquidation Assets, including, without limitation, the filing and prosecution of any motions or other papers with respect to the same and/or the amount and priority of any claim arising from such rejection, shall be borne solely by Company and its bankruptcy estate. |
| **Procedures for Closings:** | Agent and Company shall cooperate and use best efforts to consummate the closing of any sale or other disposition of any Liquidation Asset as promptly as possible. All payments to Agent and all rights to Proceeds shall be free and clear of Liens and claims and shall not require any further Bankruptcy Court order. At each closing, Company will deliver to the Agent's designee such documents and agreements as are provided for in the applicable transaction agreements to consummate the sale of the applicable Designated Third Party Assets or the GWNE Assets, as the case may be. Agent will prepare (and deliver to Company for its execution) the assignments, bills of sale, deeds, transfer tax declarations, and other closing documents to be delivered in connection with the closing in the forms contemplated in the applicable transaction agreements or otherwise in form reasonably acceptable to Company; provided, however, that Company will reasonably cooperate with Agent in such preparation. |
| **Contracts & Real Property Leases:** | Notwithstanding anything contained herein, Company covenants and agrees to pay to the counterparties under the Real Property Leases and Contracts when due all amounts payable under the Real Property Leases and Contracts from and after the Petition Date and as required by the Bankruptcy Code until each such Real Property Lease or Contract is sold and assumed and assigned or rejected. From and after the Closing Date, absent the Agent's written consent, Company shall not reject or cause any Real Property Lease or Contract to be rejected and shall defend (at Company's sole cost and expense) any attempt to cause the rejection of any Real Property Lease or Contract. Company, at its sole cost and expense, shall promptly (i) file a motion seeking to extend the deadline to assume or reject the Real Property Leases through and including the date that is 210 days after the Petition Date and (ii) reject any Real Property Lease or Contract designated by Agent from time to time pursuant to section 365 of the Bankruptcy Code. |
| **Additional Rights:** | In addition to any other rights granted to Agent elsewhere in this Term Sheet or set forth in the Definitive Documents, Agent shall be permitted to conduct the Sale throughout the Sale Term without compliance with any "liquidation sale laws" consistent with orders customarily entered by the Bankruptcy Court in  the District of |

17

Delaware, and the Agent shall conduct the Sale in the name of and on behalf of the Company in a commercially reasonable manner and in compliance with the terms of Definitive Documents and subject to the Approval Order.

Additionally, the Agent, in the exercise of its reasonable discretion shall have the right (subject to the terms of the Joint Venture Agreement):

(i) to immediately upon the Closing Date make preparations for and conduct one or more private or public sales (including, but not limited to, one or more public auction sales) of the Liquidation Assets at the Locations (each a "Future Sale" and collectively, the "Future Sales") and, subject to payment of the Guaranteed Amount, Agent shall retain for its sole and exclusive benefit all proceeds from such Future Sales;

(ii) to establish Sale prices for all Liquidation Assets and discounts and Location hours;

(iii) except as otherwise expressly included as an Store Closing Expense, to use without charge during the Sale Term, all Liquidation Assets;

(iv) (i) to be provided by Company (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Company's central office facility to effect the Sale; and (iii) to use all Intellectual Property utilized by Company in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Company in order for Company to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(v) to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "everything must go", or similar themed including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers;

(vi) to transfer Liquidation Assets among Company's Locations;

(vii) at any time from and after the Closing Date through and

18

| | | |
|---|---|---|
| | | including the Sale Termination Date, upon Agent's written request and in Agent's sole and absolute discretion, Agent shall have the right to take title to any Liquidation Assets in its name or the name of a third party designee;<br><br>(viii)    include additional agent goods in the Store Closing Sale; and<br><br>take any and all actions associated with or related to the Designation Rights and contemplated by this Agreement. |
| **Conduct of the Business:** | | From and after execution of this Term Sheet through the Closing Date, the Company shall operate its business in the ordinary course, consistent with the debtor-in-possession financing and the budget approved by the Bankruptcy Court.  Notwithstanding the foregoing, the Company may terminate that certain lease with Equity Fund Advisors, Inc., dated as of March 10, 2009, as amended, related to the store located in the Barrywoods Crossing shopping center in Kansas City, MO (the "Closed Store"); provided, however, that the Company shall move all Inventory and Personal Property located at the Closed Store to one or more of the Company's Locations at its own expense prior to such termination and the Company shall not conduct any "store closing", "sale on everything", "everything on sale", "everything must go", or similar themed sales at the Closed Store. |
| **Central Services:** | | From and after the Closing Date, certain Central Services, as determined by GWNE (in consultation with Agent) will be transitioned to GWNE as part of a transition services agreement with the Company or as a result of rehiring certain of the Company's employees to perform such Central Services post-Closing.  To the extent that GWNE transitions Central Services required by the Agent, the Agent and GWNE will mutually agree upon the Agent's utilization of such required Central Services.   For Central Services not transitioned to GWNE, but for which the Agent reasonably requires utilization, the Company shall provide all such requested Central Services in connection with the Store Closing Sale and the Joint Venture shall reimburse the Company for the actual cost of providing such requested Central Services until expiration of the Store Closing Sale Term. |
| **Definitive Documents:** | | The transactions contemplated hereby shall be made pursuant to a definitive agency agreement (the "Agency Agreement") and related documents and agreements, including without limitation the GWNE APA (collectively, the "Definitive Documents"), in form and substance satisfactory to each member of the Joint Venture and Company, which shall contain (a) terms and provisions consistent with those contained herein or as modified by a change or development that |

| | |
|---|---|
| | occurred prior to or occurs after the date hereof, (b) other conditions, representations and agreements customary in similar transactions and similar Store Closing Sale and Asset Sales transactions under section 363 of the Bankruptcy Code (including, without limitation, specific warranties and representations with respect to the absence of environmental conditions and related items) and (c) specific provisions regarding prorations. |
| **Bankruptcy Court Filing:** | The transactions contemplated by this Term Sheet are subject to the filing by Company of a case under chapter 11 of the Bankruptcy Code by no later than November 4, 2013. On the Petition Date, Company shall file a motion seeking entry of the Bid Procedures Order and the Approval Order. |
| **Confidentiality:** | The Company and the Joint Venture agree that this Term Sheet, the subject matter hereof, and all communications (written or oral) concerning this Term Sheet are strictly confidential and shall not be disclosed by the Company or the Joint Venture, or in each case, its respective parent entities, general and limited partners, subsidiaries, affiliates, officers, directors, employees, agents, lawyers, investment bankers, and other representatives (collectively, "<u>Representatives</u>"), to any third party (other than, in the case of the Company and the Joint Venture, such party's respective Representatives) and with respect to the Company, the Company's lenders and their representatives, absent the consent of the non-disclosing party. |
| **Exclusivity:** | Company hereby agrees that for a period commencing as of 5:00 p.m. CT on the day the Company signs this Term Sheet and running until the earlier of (i) execution of Definitive Documents and (ii) 5:00 p.m. CT seven (7) days after signing of the Term Sheet (unless extended by mutual written agreement), the Company shall not execute an agreement for (a) a sale, transfer, assignment, conveyance, or other disposition of the Liquidation Assets or (b) a sale of any securities, shares, membership interests or other ownership interests of the Company or any of its affiliates that own, are pursuing the purchase of, or have any other interest in or rights to acquire the Assets (the foregoing (a) and (b), collectively, the "<u>Prohibited Transactions</u>"); however, the Company and its Representatives may continue to directly or indirectly, solicit, initiate, encourage or entertain any inquiries or proposals from, discuss or negotiate with, provide any nonpublic information to, or consider the merits of any inquiries or proposals from any person or entity that could reasonably be expected to lead to a Prohibited Transaction. Notwithstanding anything to the contrary herein, any "Exclusivity" shall expire upon the Petition Date.

At the expiration of the period set forth in this "Exclusivity" section, |

| | |
|---|---|
| | this Term Sheet shall terminate and expire automatically, with both parties relieved of any further liability or obligation, except with respect to any breach of any binding provision of this Term Sheet arising or occurring at or prior to such time.<br><br>Notwithstanding anything to the contrary, this Term Sheet does not obligate either party to proceed with the transactions contemplated hereby. Instead, the parties hereby indicate their intent to negotiate in good faith the terms and conditions of Definitive Documents that are consistent with the terms and conditions hereof. |
| **Counterparts:** | Copies of this Term Sheet may be executed by the Company and the Joint Venture, separately, and when each of them has executed a copy thereof and transmitted by facsimile or email pdf, such copies taken together shall be deemed a fully executed and original Term Sheet. |
| **Expiration:** | The parties shall execute this Term Sheet on or before 5:00 pm CT on November 1, 2013 failing which this Term Sheet shall be null and void, deemed withdrawn, and of no further force or effect. |
| **Publicity:** | There will be no public disclosure with respect to the Term Sheet unless mutually agreed to in writing by the parties. |
| **Notice:** | Whenever any notice, demand, or request is required, recommended or permitted under this Term Sheet, such notice, demand or request shall be in writing, and shall be deemed to have been properly given or served:<br><br>(a) When delivered in person to the property of a party or its authorized agent; or<br><br>(b) Two business days after being deposited in the United States mail, with adequate postage prepaid, and sent by registered or certified mail with return receipt requested to a party; or<br><br>(c) The next business day after being sent by Federal Express or similar overnight courier, to a party at its address set forth in the signature blocks, below, or<br><br>(d) The day when given if delivered to a party at its facsimile number or electronic mail address set forth in the signature blocks below. |
| **Nature of this Term Sheet:** | Except for the obligations described in the sections entitled "Confidentiality", "Exclusivity", "Counterparts", "Expiration", "Publicity", "Notice", and "Nature of this Term Sheet", this Term Sheet is not intended to be binding and will not give rise to any right or obligation based on any legal or equitable theory (including any |

right or obligation to continue any negotiations), it being intended that only Definitive Documents, if executed and delivered by the parties as provided above, will bind the parties as to any matter which is the subject of this Term Sheet.   With respect to the sections entitled "Confidentiality", "Exclusivity", "Counterparts", "Expiration", "Publicity", "Notice", and "Nature of this Term Sheet", this Term Sheet shall be and is binding upon the parties once executed and delivered by the parties as provided above.

If any party brings suit to enforce the binding provisions of this Term Sheet, the prevailing party in such suit shall be entitled to recover its reasonable attorneys' fees, court costs and other expenses of such suit. This Term Sheet is intended to replace in all respects all prior written statements or other communications regarding the proposed transaction discussed herein.   All prior negotiations and writings between the parties are merged in this Term Sheet and there are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between the parties other than as set forth herein.

[Signatures Follow]

If the foregoing reflects your understanding, please so indicate by signing and filling in the applicable information in the spaces provided below and return a signed copy to the undersigned.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC,
on behalf of itself and the Joint Venture

By:_____
Print Name: Ian S. Fredericks
Its: VP, Assistant General Counsel, Managing Member
Facsimile: (847) 897-0859
Email: Ifredericks@hilcotrading.com

GWNE, Inc.
on behalf of itself and the Joint Venture

By:_____
Print Name:
Its:
Facsimile:
Email:

Acknowledged this ___ day of October, 2013:

EDWIN WATTS GOLF SHOPS, LLC

By_____
Print Name:_____
Its:_____
Facsimile:_____
Email:_____
Address:_____

23

If the foregoing reflects your understanding, please so indicate by signing and filling in the applicable information in the spaces provided below and return a signed copy to the undersigned.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC,
on behalf of itself and the Joint Venture

By: _____
Print Name: Ian S. Fredericks
Its: VP, Assistant General Counsel, Managing Member
Facsimile: (847) 897-0859
Email: Ifredericks@hilcotrading.com

GWNE, Inc.
on behalf of itself and the Joint Venture

By: _____
Print Name: Craig McCallister
Its: CEO
Facsimile:
Email: kragomac@aol.com


Acknowledged this ___ day of October, 2013:

EDWIN WATTS GOLF SHOPS, LLC


By_____
Print Name:_____
Its:_____
Facsimile:_____
Email:_____
Address:_____

If the foregoing reflects your understanding, please so indicate by signing and filling in the applicable information in the spaces provided below and return a signed copy to the undersigned.

Very truly yours,

HILCO MERCHANT RESOURCES, LLC,
on behalf of itself and the Joint Venture

By:_____
Print Name: Ian S. Fredericks
Its: VP, Assistant General Counsel, Managing Member
Facsimile: (847) 897-0859
Email: Ifredericks@hilcotrading.com

GWNE, Inc.
on behalf of itself and the Joint Venture

By:_____
Print Name:
Its:
Facsimile:
Email:

Acknowledged this ⌊ day of ~~October~~ *November*, 2013:

EDWIN WATTS GOLF SHOPS, LLC

By_____
Print Name:  JoHN  X  WATSON
Its:_____  C EO
Facsimile:_____
Email:_____
Address:_____

23